# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| **JAMES BURNS** | * | **CIVIL ACTION NO. 08-0428**<br>**Section P** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **LYDIA SMITH, ET AL.** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a motion for summary judgment [doc. # 63] filed by defendants, Lydia Smith, Jimmy Shivers, and Larry G. Cox.[1] The motion is opposed. [doc. # 70]. For reasons set forth below, it is recommended that defendants' motion for summary judgment be **GRANTED IN PART and DENIED IN PART**.

## Procedural History

James Burns is a pre-trial detainee who has been housed since September 2007 at the Madison Parish Detention Center ("MPDC") in Tallulah, Louisiana. On March 27, 2008, he filed the instant pro se civil rights complaint under 42 U.S.C. § 1983 challenging the adequacy of his medical care at the facility and certain conditions of his confinement. In his complaint, and two amendments thereto,[2] Burns alleged that he continues to receive inadequate treatment for

---

[1] The two remaining defendants, Sgt. Kenneth Cheatham and Sgt. Cedric Richardson, did not join in the instant motion for summary judgment.

[2] doc. #s 1, 11-12.

various afflictions, including diabetes,[3] syphilis, and acid reflux. He further alleged that medical supplies such as insulin and syringes are kept in an unlocked medical cart that anyone can access. He also complained about being placed in lockdown and the conditions of confinement he experienced there.

As a result of these alleged constitutional deprivations, Burns sued various officials at the MPDC, including Director of Nursing, Lydia Smith; Warden Jimmy Shivers; Madison Parish Sheriff, Larry G. Cox; Sgt. Kenneth Cheatham; and Sgt. Cedric Richardson.[4] Burns seeks an order compelling defendants to provide him with appropriate medical treatment, together with compensation for his "irreversible and future damages."

On July 1, 2008, the undersigned determined that plaintiff's allegations were facially meritorious, and ordered service upon defendants. (*See* July 1, 2008, Memorandum Order [doc. # 13]). Defendants answered the complaint on October 30, 2008. (Answer [doc. # 18]). On February 11, 2009, plaintiff filed a motion for a temporary restraining order ("TRO") and preliminary injunction, which the court denied following a February 19, 2009, hearing. [doc. #s 29, 33].[5] The court then granted plaintiff's motion for trial by jury, and issued a November 9, 2009, trial setting in the matter. [doc. #s 42-43].

On May 15, 2009, defendants, Smith, Shivers, and Cox, filed the instant motion for

---

[3] Burns also questioned the composition of the diabetic diet provided by the facility.

[4] Burns did not specify whether he was suing defendants in their individual or official capacities. However, because he is proceeding pro se, the court will liberally interpret his complaint as suing defendants in both capacities. *Gaines v. Bordelon*, 2009 WL 361183, 2 (M.D. La. Feb. 12, 2009).

[5] Burns and defendant, Smith, testified at the hearing under oath. [doc. # 45].

summary judgment seeking dismissal of plaintiff's claims. [doc. # 63].[6] Although plaintiff

obtained an extension of time until June 29, 2009, to file an opposition to the motion, he filed his

memorandum on June 4, 2009. [doc. #s 68-70]. The matter is now before the court.

## Summary Judgment Standard

Summary judgment is appropriate when the evidence before the court shows that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law. F.R.C.P. Rule 56(b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An

issue is "genuine" under this standard if the non-moving party has presented sufficient evidence

that a reasonable jury could return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). While the facts are to be reviewed with all inferences drawn in favor of the

non-moving party, factual controversies are resolved in favor of the non-movant only when there

is an actual controversy. That is, when both parties have submitted evidence of contradictory

facts. *McCallum Highlands, Limited v. Washington Capital DUS, Inc.*, 66 F.3d 89 (5th Cir.

1995).

The moving party bears the initial burden in summary judgment and must demonstrate

through portions of the pleadings, depositions, answers to interrogatories, admissions and/or

affidavits that no genuine issue of material fact exists. *Celotex Corp.*, 477 U.S. at 323. Once the

moving party has successfully demonstrated the absence of a genuine issue of material fact, the

burden shifts to the non-moving party to show the opposite. *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986). In doing so, the non-moving

---

[6] The motion for summary judgment does not address plaintiff's claims against
defendants in their official capacities. Accordingly, the ensuing analysis is limited to plaintiff's
individual capacity claims against the moving defendants.

party may not merely rely on the allegations and conclusions contained within the pleadings; rather, he "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). Furthermore, these specific facts must be shown through something more than "some metaphysical doubt as to the material facts, by conclusory allegations, or by a mere scintilla of evidence." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Ultimately, however, the court must resolve all doubts against the moving party and draw any reasonable inferences raised by the evidence in favor of the non-moving party. *See Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 1999).

## Analysis

### I. Inadequate Medical Care

A pretrial detainee's constitutional right to medical care (as enforced against a state actor) arises from the due process guarantee of the Fourteenth Amendment. *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000). When a pretrial detainee initiates a claim for the denial of medical care which is directed toward a particular incident, it is properly analyzed as an episodic act case, and a deliberate indifference standard is applied. *Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997) (en banc) (quoting *Hare v. City of Corinth,* 74 F.3d 633, 644 (5th Cir.1996)); *Nerren v. Livingston Police Dept.,* 86 F. 3d 469 (5th Cir. 1996). This is the same standard applied to claims brought by convicted prisoners under the Eighth Amendment. "[T]here is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care." *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir.2001).

To establish liability, a detainee must "show that a state official acted with deliberate

indifference to a substantial risk of serious medical harm and that injuries resulted." *Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir. 2000); *see also Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976). More specifically, deliberate indifference in the context of an episodic failure to provide reasonable medical care to a pretrial detainee means that: (1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the official actually drew that inference; and (3) the official's response indicates that the official subjectively intended that harm occur. *Thompson v. Upshur County, Tx.*, 245 F.3d 447, 458-59 (5th Cir. 2001). "[T]he failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 459. "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *see also Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999).

Prisoners are not entitled to the "best medical care money can buy." *See Mayweather v. Foti,* 958 F.2d 91 (5th Cir. 1992); *Woodall v. Foti*, 648 F.2d 268 (5th Cir. 1981). In *Woodall,* the Fifth Circuit stated that the test in balancing the needs of the prisoner versus the needs of the detention center is one of medical necessity, not of desirability. *Woodall, supra*. The fact that a plaintiff does not believe that his medical treatment was as good as it should have been is not a cognizable complaint under the Civil Rights Act.

1) <u>Diabetes</u>

Plaintiff contends that he has not received appropriate medical care for his diabetic condition. He alleges that he did not see a doctor for more than one year after arriving at the facility and that he has not received necessary medication. (TRO Hearing Transcript, pg. 3 [doc. # 45).[7] At the TRO hearing, however, MPDC Director of Nursing, Lydia Smith, testified that Burns never filed a sick call request to see the physician regarding his diabetic condition. (Tr. 30-31). Plaintiff's MPDC medical file indicates that on November 27, 2007, he requested a "diabetes consultation," and that Nurse Smith construed this as a request to see a social worker which she referred for appointment. (Def. Exh. B, pg. 5A). There is no indication in the medical record that plaintiff was unsatisfied with this outcome, or that he further petitioned to see the physician. In fact, plaintiff's medical records from December 2008 indicate that he complained about being seen by the physician *too frequently*. (*See* Nurses Notes, Def. Exh. B, pg. 6G).[8]

Plaintiff further alleges that until December 2008, he did not receive Glucophage/Metformin in addition to his insulin.[9] At the hearing, Nurse Smith testified that she interviewed plaintiff on October 1, 2007, when he first entered the facility, and that he stated that he had been an insulin dependent diabetic since 1996. (Tr. 25). Smith questioned Burns about his insulin and dosage, but his responses were very vague. *Id.*[10] Accordingly, Smith obtained

---

[7] Hereinafter abbreviated to "Tr."

[8] Apparently, plaintiff was not interested in incurring the $10 co-payment per visit. *Id.*

[9] Plaintiff testified that his insulin does not work properly without the Glucophage. (Tr. 3).

[10] Smith's testimony is supported by the medical intake records. (Def. Exh. B, pgs. 1-2).

record release authorizations from plaintiff so she could retrieve his medical records from LSU's E.A. Conway Medical Center and the Thompson Pharmacy. (Def. Exh. B, pgs. 2, 20A-B). Smith testified that plaintiff's medical records indicated that he was only receiving insulin for his diabetes. (Tr. 25-27). Smith relayed this information to the MPDC's contract physician, Thomas Neumann, M.D., who ordered her to resume plaintiff's insulin regimen. (Tr. 25-27).

In opposition to defendants' motion for summary judgment, plaintiff submitted records from LSU's E.A. Conway Medical Center and E.W. Thompson Pharmacy which indicate that on July 25 and August 29, 2007, he had been prescribed Glucophage/Metformin in addition to insulin. (Pl. Opp. Memo., Exhs. A-B). However, there is no direct evidence that Nurse Smith actually received this information, but then intentionally suppressed it. (*See* Def. Exh. B). Indeed, there is no apparent motivation for her to do so. Plaintiff had only recently arrived at the facility, and Smith certainly had not had time to develop any animosity towards him. Moreover, the cost of the medication could not have been a motivating consideration, because Metformin is a generic drug with only a fraction of the cost of plaintiff's insulin. (*See* Def. Exh. B, pg. 19C). Even if plaintiff's evidence suffices to support an inference that Nurse Smith was aware that he had previously been prescribed Glucophage/Metformin, plaintiff's evidence indicates that the prescriptions were only good for one month, in contrast to his insulin, which was open-ended. (*See* Pl. Exhs. A-B). By the time plaintiff arrived at the MPDC, the one month periods had expired.

At the hearing, plaintiff testified that he continuously complained about the Glucophage issue. (Tr. 22). However, the only written evidence to support his testimony is a March 11, 2008, letter from the ACLU to Warden Shivers wherein an ACLU staff attorney notified the

facility that prior to his detention, Burns received insulin and 500 mg. of Glucophage.  [doc. # 12].  Again however, assuming for purposes of this motion that defendants were aware that Burns had previously been prescribed Glucophage, Burns' summary judgment evidence indicates that the prescription was finite.  Accordingly, defendants would not have been unreasonable in surmising that the prescription was issued only on a trial basis.

In addition, plaintiff's medical record is replete with notations by the MPDC medical staff indicating that he regularly failed to take his insulin, monitor his blood glucose levels, or comply with a diabetic diet.[11]  Moreover, the medical staff periodically obtained blood samples from plaintiff and submitted them to the laboratory for analysis.  *Id., see also* Def. Exh. B, pgs. 11B-D.  These results were forwarded to the facility's contract physician, Dr. Neumann, but there is no indication that he ordered any resulting changes to plaintiff's diabetes regimen despite elevated blood sugar levels.  *Id*.  Instead, it seems that the MPDC medical personnel attributed these above normal readings to plaintiff's continued poor compliance with his diabetes regimen, despite their repeated entreaties and exhortations which plaintiff ignored.  *Id*.[12]

At the hearing, plaintiff acknowledged that he sometimes refused to take his insulin, but he said this was because the guards failed to provide the insulin during mealtimes.  (Tr. 54; Def. Exh. B, pg. 6F).  According to the medical records, MPDC nurse, Wanda Nolan, advised Burns

---

[11] *See* Nurses Notes from November 2007 through October 2008.  (Def. Exh. B, pgs. 6A-G).

[12] Plaintiff testified that prior to his arrival at MPDC, his blood sugar readings averaged below 200.  (Tr. 9-10).  However, a pre-detention medical record indicates that Burns' diabetes was poorly controlled due to his non-compliance with his insulin.  (Pl. Opp. Memo., Exh. A).  In July 2007, his blood glucose level was 406.  (Def. Exh. B, pg. 20H)

to eat a diabetic snack with the insulin. (Def. Exh. B., pg. 6F).[13] She further told him to report

any fingerstick reading above 200. *Id*. The very next day, Burns admitted that he had again

failed to take his morning insulin. *Id*. One week later, Burns still had elevated blood sugar

levels, and the prison physician, Dr. Neumann, issued orders placing Burns under medical

observation; he directed the nurse to administer all insulin until Burns' blood sugar returned to

normal limits. *Id*. at pg. 6G.[14]

From October 24, 2008, until December 16, 2008, plaintiff remained in a medical

observation cell. (Tr. 35-36). During this period, he was seen by Dr. Neumann who commenced

treatment with Glucophage/Metformin. (*See* Def. Exh. B, pgs. 6G, 19C). On December 16,

2008, plaintiff was released into a medical dormitory so medical personnel could monitor and

control his diet. (Tr. 36).

Plaintiff contends that he still does not receive an appropriate diabetic diet. However,

Nurse Smith testified that plaintiff receives a diabetic diet consisting of brown rice, baked egg

noodles, and no fried foods or sweets. (Tr. 43). Burns also receives a diabetic snack of milk and

---

[13] As it turns out, Burns had built up a significant stash of food in his cell. (Def. Exh. B, pg. 13). Burns' prison commissary records also reveal considerable purchases seemingly inconsistent with a diabetic diet. (*See* Def. Exh. B., pgs. 21A-AC). Due to plaintiff's continued non-compliance with a diabetic diet, Nurse Smith took steps in July 2008 to restrict Burns' commissary account to non-food items only. *Id*. at pg. 6E.

[14] Dr. Neumann ordered plaintiff placed in a medical observation cell on October 24, 2008, the day after defendants were served with the instant suit. Plaintiff questions the timing of this event. However, plaintiff's history of poor compliance with his diabetes regimen reveals that the medical staff were already moving in this direction prior to October 24. Moreover, the transfer decision was apparently rendered by two non-defendants, Dr. Neumann and Nurse Nolan.

peanut butter and wheat bread.  *Id*.  The diet is appropriate for diabetics.  (Tr. 44-45).[15]

In his opposition, plaintiff represented that he will provide witnesses to verify the insufficiency of the diabetic meals provided by MPDC.  To withstand defendants' motion for summary judgment, however, plaintiff must come forward with evidence to support his claims. He has not done so.  Instead, Burns asserted that the nurses and deputies have made "numerous attempts" to ensure that the kitchen staff comply with the inmates' diabetic needs.  (Opp. Memo., pg. 10).  This hardly sounds like defendants were/are deliberately indifferent to his medically required diet.

The evidence currently before the court fails to demonstrate that defendants actually inferred a substantial risk of harm due to the treatment he received for his diabetes (including his diet), or that they subjectively intended him to be harmed.  The only named defendant who was in a position to know about the alleged insufficiency of plaintiff's treatment was Nurse Smith. To the extent that the court must assume for purposes of this motion that Smith was aware of Burns' pre-detention prescription for glucophage/metformin, it was not unreasonable for her not to perpetuate the medication because it was only prescribed for a one month period.  Moreover, the MPDC's contract physician was made aware of plaintiff's high blood sugar levels, yet there is no evidence that he ordered a change in plaintiff's treatment to include glucophage/metformin – at least until November 2008 when plaintiff was compelled to meet with him.  In fact, Nurse Smith testified that her understanding from Dr. Neumann was that if insulin was not working, then glucophage would not make much of a difference.  (Tr. 46-47).  "[A]n official's failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for

_____

[15]  MPDC has a certified employee to provide the appropriate diets.  (Tr. 44).

commendation, cannot under our cases be condemned as the infliction of punishment."

*Olabisiomotosho v. City of Houston*, 185 F.3d 521, 528 (5ᵗʰ Cir. 1999).  Rather than ignoring

plaintiff's diabetic condition, Nurse Smith took steps to restrict his access to improper foods by

limiting his commissary access.  It therefore does not follow that she was deliberately indifferent

to a serious medical need.  *See, Rhyne v. Henderson County*, 973 F.2d 386, 393 (5th Cir.1992)

(defendants' efforts indicated concern, not apathy).[16]

   2) Syphilis

   Plaintiff claims that for five to six months defendants failed to treat him for syphilis.

However, it is uncontroverted that approximately two days after Burns arrived at the MPDC,

Nurse Smith advised Burns that there was a possibility that he had been exposed to syphilis.  (Tr.

38, 10).[17]  Thus, she obtained his consent to be tested and submitted the samples to the health

unit in Tallulah.  (Tr. 39).  According to Smith, the health unit will only notify a patient if the test

result is positive.  (Tr. 39).  Burns never advised defendants that he had tested positive for

syphilis.  (Tr. 39-40).  Nevertheless, following receipt of a March 11, 2008, letter from the

ACLU advising the MPDC that Burns was experiencing various syphilis-related symptoms,

---

[16]  Plaintiff further alleges that MPDC stores his insulin in unrefrigerated, unlocked carts in the hall, and that syringes are not individually packaged.  He contends that any inmate can access them and he cannot tell whether an individual syringe has been used.  Assuming the veracity of plaintiff's allegation for purposes of this motion, there is no evidence that any named defendant was aware of this practice.  (*Contrast* Testimony of Nurse Smith, Tr. 28-29).  Moreover, "unpackaged" needles, in the absence of any evidence that they were previously used or unsanitary, are not unconstitutional.  *See Hoffman v. Tuten*, 446 F. Supp.2d 455, 461 (D.S.C.,2006); *see also Luck v. Fox*, 2009 WL 1172860 (E.D. Va. Apr. 28, 2009) (no constitutional violation where no indication that medical equipment was unsterilized or unsanitary).

[17]  Dan Mann from the Ouachita Parish Health Department visited the MPDC and recommended that Burns be tested due to possible exposure to syphilis.  (Tr. 38).

Nurse Smith re-tested Burns and sent the samples to a facility where the MPDC would have access to the results. (Tr. 40). This time, the tests returned positive for syphilis. (Tr. 40-41; Def. Exh. B, pg. 11H).[18] Accordingly, the MPDC began the treatment protocol for syphilis: two shots of Bicillin L-A in the bilateral hips for three weeks. (Tr. 41). After Burns completed the course of treatment, the MPDC ran a follow-up test to confirm that he had responded to the treatment. (Tr. 41-42). He had. *Id.*

The foregoing facts fail to establish that defendants were deliberately indifferent to plaintiff's serious medical need. Nurse Smith initiated contact with Burns regarding his need for testing. However, the initial test results came back negative. As soon as MPDC received notice that Burns was experiencing syphilis-related symptoms,[19] they re-tested him, and then promptly commenced treatment, to which he favorably responded.[20]

3) Acid Reflux

Plaintiff claims that he developed acid reflux disease and eventually was prescribed an effective drug, Omeprazole, which Nurse Smith subsequently discontinued once she learned of the instant lawsuit. (Pl. Opp. Memo., pg. 8). Now, Burns has had to resort to taking four Zantac per day. *Id.* However, plaintiff's medical records reveal that Nurse Smith dispensed Zantac to

---

[18] After receiving the positive result, Nurse Smith contacted the Ouachita Parish Health Department to obtain the test results from the October 2007 sample. (Tr. 41). They confirmed that the first test was non-reactive. *Id.*

[19] There is no indication that defendants were aware of Burns' syphilis related symptoms in the intervening months between October 2007 and March 2008.

[20] Plaintiff seeks to obtain a medical examination to determine whether the syphilis caused any permanent damage to his internal organs. (Tr. 11). However, there is no evidence that an examination is necessary to remedy any existing risk of harm.

Burns as early as November 2007. (Def. Exh. B., pg. 5A).[21] Moreover, plaintiff does not allege

that Zantac does not work, only that he has to take four per day. (*See* Opp. Memo., pg. 8). The

fact that a plaintiff disagrees with what medical care is appropriate does not suffice to establish

deliberate indifference to serious medical needs. *See Norton v. Dimazana*, 122 F.3d 286, 292

(5th Cir.1997).

## II.  Lockdown

Plaintiff was placed in "lockdown" on two occasions, from September 29, 2007, until

November 29, 2007,[22] and from October 24, 2008, until December 11, 2008. (Tr. 20). He

challenges the MPDC's decision to place him in "lockdown," and the various conditions

associated with this restricted confinement.[23]

1)  Placement in Lockdown

In *Bell v. Wolfish*, the Supreme Court determined that conditions of pretrial detention are

---

[21]  Indeed, Burns admitted that he received acid reflux medicine after he filed a grievance. (Tr. 21).

[22]  Pl. 2nd Amend. Compl. [doc. # 12].

[23]  Although the instant record does not reveal whether Burns suffered a resulting physical injury while in lockdown, he may still obtain injunctive relief or recover nominal damages for any constitutional injury suffered. *Herron v. Patrolman No. 1*, 111 Fed. Appx. 710, 713 (5th Cir. Sept. 28, 2004) (unpubl.) (citations omitted).

With regard to plaintiff's claim for injunctive relief, the undersigned observes that because plaintiff is no longer in lockdown, he conceivably does not enjoy standing to challenge his former conditions of confinement while in lockdown. *See Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1285 (5th Cir. 1992) (standing requires real and immediate injury, traceable to defendant's alleged unlawful conduct, with relief from the injury likely to follow from a favorable ruling). Nonetheless, plaintiff may still enjoy standing to pursue equitable relief for past wrongs when he demonstrates "either continuing harm or a real and immediate threat of repeated injury in the future." *Id*. Here, plaintiff has been placed in lockdown on more than one occasion. Thus, it is not improbable that he may be exposed to the same conditions that he experienced previously.

constitutional under the Due Process Clause as long as they do not amount to punishment of the

detainee prior to an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 (1979).

The Court recognized the distinction between "punitive measures that may not constitutionally

be imposed prior to a determination of guilt and regulatory restraints that may." *Id.* at 537

(emphasis supplied). Thus, restrictions on detainees that are reasonably related to a prison's

interest in maintaining order and security may be considered regulatory restraints that simply do

not rise to the level of constitutionally prohibited punishment. *Id.* at 539-40. Whether such a

relationship exists is "peculiarly within the province and professional expertise of corrections

officials, and, in the absence of substantial evidence in the record to indicate that the officials

have exaggerated their response to these considerations [of order and security], courts should

ordinarily defer to their expert judgment in such matters." *Id.* at 540 n.23 (quoted source

omitted); *see also Luken v. Scott*, 71 F.3d 192, 193 (5th Cir.1995) (holding that "administrative

segregation, without more, does not constitute a deprivation of a constitutionally cognizable

liberty interest.").

    In this case, Nurse Smith testified that plaintiff was initially placed in lockdown so he

could have a bottom bunk because of the lack of available bottom bunks in the regular

dormitories. (*See* Tr. 32-33). According to the MPDC's medical screening form, a bottom bunk

is required for diabetics. (Def. Exh. B, pg. 1).[24] Burns was later transferred to the regular

dormitory as soon as a bottom bunk became available. *Id.*[25] In other words, Burns' first stay in

---

[24] The box on Burns' form was checked. *Id*.

[25] In his opposition, Burns alleges that he was eventually moved from a bottom bunk to a top bunk because MPDC assigned the bottom bunk to an inmate with AIDS. (Opp. Memo., pg. 9). This allegation, however, does not undermine the stated rationale for his placement in

lockdown stemmed from his medical need for a bottom bunk.

Defendants introduced an affidavit from Major Antonio Johnson, together with accompanying records which indicate that when Burns first arrived at the MPDC on September 29, 2007, he was placed in lockdown on suicide watch.  (Affidavit of Antonio Johnson, Def. Exh. C).  Plaintiff seems to argue that this explanation is inconsistent with Nurse Smith's stated rationale for his initial lockdown.  (Pl. Opp. Memo., pg. 9).  However, September 29, 2007, was a Saturday, and plaintiff was not initially seen by Nurse Smith until Monday October 1, 2007. (*See* Officers' Daily Activity Report, Def. Exh. C; Medical Screening form, Def. Exh. B).  Thus, the two proffered explanations for plaintiff's initial lockdown do not overlap temporally, and are not inconsistent.

Defendants also adduced uncontroverted evidence that in October 2008 Burns was placed in a medical observation cell (or as plaintiff calls it "lockdown") upon order of the prison physician because of Burns' elevated blood sugar levels.  (Def. Exh. B, pg. 6G).  The medical observation cell is a two person cell which is used to control what goes in and out of the dormitory, including medication.  (Tr. 35).  During this period of heightened confinement, medical personnel administered insulin and finger sticks to Burns every day.  (Tr. 36).  He was later transferred to a medical dormitory.  *Id*.  Thus, plaintiff's second stay in "lockdown" was also for medical reasons.

"Prison officials should ... be accorded the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order." *McCord v.*

---

lockdown because it is conceivable that the other inmate may have had a greater need for a bottom bunk.  Moreover, there is no evidence as to the length of time that he was deprived of a bottom bunk.

*Maggio*, 910 F.2d 1248, 1251 (5th Cir.1990) (citing Bell, 441 U.S. at 547). Furthermore, "it is well settled that '[p]rison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status.'" *Id.* (quoting *McGruder v. Phelps*, 608 F.2d 1023, 1026 (5th Cir.1979)). Prison authorities may subject detainees to "the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* Finally, since detainees have no cognizable liberty interest in their custodial classification, their ultimate classification remains a matter within the sound discretion of prison officials. Absent an abuse of that discretion, federal courts may not interfere with custodial classifications established by prison officials. *Whitley v. Hunt*, 158 F.3d 882, 889 (5th Cir.1998) (citations omitted), abrogated on other grounds by *Booth v. Churner*, 532 U.S. 731, 735, 121 S.Ct. 1819 (2001).

Here, plaintiff has not demonstrated that defendants abused their discretion by placing him in "lockdown" to meet his medical needs.[26] Accordingly, he has not established a constitutional violation.

2) Overcrowding

In his complaint, plaintiff alleged that he was "placed in a two-man cell with up to a maximum of 14 inmates." (Compl. pgs. 4-5).[27] In support of their motion for summary

---

[26] Nonetheless, simply because defendants had valid medical reasons to place plaintiff in lockdown, does not justify all of the conditions of confinement typically experienced by other inmates who were subjected to lockdown for other reasons, e.g. disciplinary or security concerns.

[27] Plaintiff signed his complaint under penalty of perjury which is considered competent summary judgment evidence. *See* 28 U.S.C. § 1746.
In his opposition memorandum, plaintiff further alleged that on several occasions, his "lockdown" cell was overcrowded with anywhere from four to fourteen inmates. (Pl. Opp. Memo., pg. 9). It too was signed under penalty of perjury.

judgment, defendants adduced evidence that MPDC holds 14 inmates in lockdown, with a bed for each inmate. (Affidavit of Antonio Johnson; Def. Exh. C). However, in the context of a motion for summary judgment, the court must resolve factual controversies in favor of the non-movant. *Little*, 37 F.3d at 1075. Although, the Supreme Court has indicated that requiring detainees to share a space designed for half the number of actual occupants for up to 60 days does not violate the Constitution,[28] plaintiff has adduced evidence that he was compelled to share a cell with up to seven times the number that it was designed to hold. In the absence of other mitigating evidence, defendants have not established that they are entitled to a judgment as a matter of law regarding plaintiff's overcrowding claim.

3) Denial of Outdoor Recreation

In their motion, defendants cite an excerpt from the TRO hearing where plaintiff arguably acknowledged that he received outdoor recreation while in lockdown. (Tr. 19). However, the excerpt stemmed from plaintiff's response to a compound question, and it is not clear whether he was referring to access to the law library, access to the recreation yard, or both. *Id*. Further, in his opposition memorandum, plaintiff clarified that it was only during his first month in lockdown that he was not allowed on the recreation yard. (Opp. Memo., pg. 9).

A pretrial detainee's right to outdoor recreation is measured under the guiding principles set forth in *Bell*, i.e., whether the conditions amount to punishment of the detainee. *See Mayfield v. Ellett*, 102 F.3d 549, 1996 WL 670432, *6-8 (5th Cir. Oct. 29, 1996) (unpubl.); *Bell*, 441 U.S. at 535, 99 S.Ct. at 1872. "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative

---

[28] *See Bell, supra*

purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Bell, supra* (citations omitted). If the condition or restriction of pretrial detention is "not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.*

Pretrial detainees may also advance claims for denial of outdoor exercise opportunities under the Eighth Amendment. *See Hamilton v. Lyons*, 74 F.3d 99, 105-107 (5th Cir. 1996) (discussing parolees). Such claims should be evaluated on a case by case basis by evaluating the following criteria "(1) the size of the inmate's cell; (2) the amount of time the inmate spends locked in his cell each day; and (3) the overall duration of the inmate's confinement." *Hewitt v. Henderson*, 271 Fed. Appx. 426, 428 (5th Cir. Mar. 26, 2008) (unpubl.) (citations omitted).

As in *Hewitt*, the instant record is incomplete regarding the size of Burns' cell, the degree to which in-cell exercise was practicable;[29] whether Burns received some form of regular out-of-cell exercise or another appropriate exercise alternative; whether Burns was exposed to fresh air and sunlight during his recreation periods; and the amount of time he was required to spend in his cell each day. *Hewitt, supra*. Moreover, on the instant record, the court cannot discern a legitimate rationale for depriving a pretrial detainee, such as Burns, of outside recreational opportunities for 30 days when there is no indication that he had committed any disciplinary infractions or otherwise presented an extraordinary security risk sufficient to warrant

---

[29] Which remains doubtful, if up to 14 inmates were housed in a two-man cell. *See* discussion, *supra*.

such a restriction.  Accordingly, defendants have not established that they are entitled to judgment as a matter of law.

    4) <u>Denial of Church Services</u>

Plaintiff argues that defendants unlawfully abridged his right to practice his religion while confined in lockdown.  Specifically, in his second amended complaint, he alleged that he was not "allowed to come out for church call."  (Pl. Resp., ¶ III [doc. # 12]).  At the TRO hearing, Burns explained that he was not permitted to attend night time church services.  (Tr. 20).[30]  He maintained his challenge to the inability to attend church services in his opposition to defendants' motion for summary judgment.  (Opp. Memo., pg. 9).

Pretrial detainees such as plaintiff, clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion.  The constitutional standard for evaluating a detainee's claim that a prison regulation or practice improperly restricts his right to the free exercise of his religion requires the court to evaluate the regulation or practice in order to determine whether it "is reasonably related to legitimate penological interests."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400 (1987).[31] The "reasonableness" of a regulation or practice is evaluated based upon the following inquiry: (1) Is there a valid, rational connection between the prison practice and the legitimate

_____

[30]  Nurse Smith testified that "inmates" in the medical unit receive recreation time and access to church services.  (Tr. 37).  It appears however, that she was addressing conditions in the medical dormitory, as opposed to the conditions in lockdown.  (Tr. 36-37).  Moreover, to the extent that there is a conflict between Smith and Burns' testimony, the court must construe the disputed fact in favor of the non-movant.  *Little, supra.*

[31]  The same test applies to pretrial detainees.  *See Carter v. Lowndes County*, 89 Fed. Appx. 439, 442 (5th Cir. Jan. 23, 2004) (unpubl.).

governmental interest put forward by prison officials to justify the practice? (2) Are there

alternative means of exercising the right that remain open to prison inmates, that is, are inmates

allowed other means to express their religious beliefs on a general level? (3) What impact will

accommodation of the asserted constitutional right have on guards and other inmates and on the

allocation of prison resources generally? and, (4) Are alternatives to the prison practice available

that would accommodate the inmates' rights at a *de minimis* cost to valid penological interests?

*Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254 (1987), *Green v. Polunsky*, 229 F.3d 486, 489-90

(5th Cir.2000). Each factor need not be considered, and the factors need not be evaluated evenly.

*Scott v. Mississippi Dep't of Corrections*, 961 F.2d 77, 80 (5th Cir.1992).

   Liberally construed, plaintiff's complaint also states a viable claim under the Religious

Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §2000cc *et seq*. The RLUIPA

mandates that,

> [n]o government shall impose a substantial burden on the religious exercise of a
> person residing in or confined to an institution ... even if the burden results from a
> rule of general applicability, unless the government demonstrates that imposition
> of the burden on that person –
>> (1)  is in furtherance of a compelling governmental interest; and
>>
>> (2)  is the least restrictive means of furthering that compelling
>>     governmental interest.

42 U.S.C. § 2000cc-1(a).

The Supreme Court has noted that RLUIPA protects the rights of prisoners who are unable to

freely attend to their religious observances and who are dependant on the government's

permission and accommodation. *Cutter v. Wilkinson*, 544 U.S. 709, 721, 125 S.Ct. 2113, 161

L.Ed.2d 1020 (2005).

   In order to state a claim under RLUIPA, the prisoner must show that the challenged

government action places a substantial burden on the exercise of his religion.  If the prisoner carries the burden of proof on this issue, then the government must demonstrate some compelling interest warranting the challenged action.  Under RLUIPA, a "religious exercise"  includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A).  Thus, religious services, religious education, and dietary principles all qualify as "religious exercises."

While the statute does not define "substantial burden," Fifth Circuit  jurisprudence has defined it as follows in the context of the RLUIPA, "... a government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs."  *Adkins v. Kaspar*, 393 F.3d 559, 569-70 (5th Cir. 2004).  Whether the government action or regulation imposes a substantial burden on an adherent's exercise requires a case-by-case, fact-specific inquiry.  *Id.*

In this case, plaintiff has not adduced evidence to establish that his inability to attend church services substantially burdened the exercise of his religion.  However, he did not bear the burden of doing so in response to defendants' motion, where defendants failed to address or even raise the issue.  Moreover, it is not clear that he will be unable to meet his burden.[32] Furthermore, on the instant record, there is no evident justification for MPDC's apparent policy of withholding church services to those detainees or inmates placed in lockdown for medical reasons.  Accordingly, defendants have not established that they are entitled to judgment as a

---

[32]  The court understands the obvious difficulty that defendants face in trying to identify plaintiff's various claims, especially with regard to his conditions of confinement while in lockdown.  However, the court extended the discovery period in this matter, and there is no apparent reason why defendants could not have obtained further clarification from plaintiff.

matter of law.

5) <u>Incidental Macing and Excessive Force Injuries to other Inmates</u>

Plaintiff alleges that while he was in lockdown he observed several prison guards beat other inmates and spray them with mace. (2nd Amend. Compl. [doc. # 12]). In his opposition to defendants' motion for summary judgment, plaintiff added that he was incidentally affected by the mace sprayed on the other inmates. (Opp. Memo., pg. 9). However, plaintiff lacks standing to assert an excessive fore claim on behalf of inmates other than himself. *Berry v. Windham*, 2008 WL 2455614 (W.D. La. May 29, 2008). Moreover, the incidental macing is properly analyzed as an episodic act, and there is no evidence that any defendant subjectively intended to injure plaintiff.

6) <u>No Dessert and Constant Illumination</u>

Plaintiff alleges that while he was in lockdown, he did not receive dessert, and that his cell was constantly illuminated. (*See* Compl., 2nd Amend. Compl.).[33] However, defendants' alleged failure to provide Burns with dessert or his sugary drink of choice is a de minimis deprivation, especially where, as here, plaintiff required a diabetic diet. *See Hamilton, supra* (Constitution is not concerned with de minimis impositions on pretrial detainees). Moreover, although defendants did not address the lighting issue and did not proffer any rationale for the policy, it is manifest that the lights are kept on to protect the guards from potential assaults by the inmates housed in lockdown. *See Chavarria v. Stacks*, 102 Fed. Appx. 433, 436 (Jul. 20, 2004) (unpubl.). Under these circumstances, the Fifth Circuit has held that 24-hour illumination does

---

[33] In his opposition memorandum, plaintiff added that while in lockdown, he also did not receive any Kool-Aid. (Opp. Memo., pg. 9).

not violate the Constitution. *Id.*

**Conclusion**

For the reasons set forth above, the undersigned finds that there is no genuine issue as to any material fact and that defendants, Lydia Smith, Jimmy Shivers, Larry G. Cox, are entitled to judgment as a matter of law, dismissing plaintiff's claims against them in their individual capacities for inadequate medical care and diet, placement in lockdown, incidental macing, excessive force injuries to other inmates, withholding of dessert, and constant illumination. Fed.R.Civ.P. 56. Defendants have not established that they are entitled to judgment as a matter of law with respect to plaintiff's other claims. Accordingly,

IT IS RECOMMENDED that the motion for summary judgment [doc. # 63] filed by defendants, Lydia Smith, Jimmy Shivers, and Larry G. Cox, be GRANTED IN PART, and that judgment be entered in favor of said defendants, dismissing with prejudice plaintiff's individual capacity claims for inadequate medical care and diet, placement in lockdown, incidental macing, excessive force injuries to other inmates, withholding of dessert, and constant illumination, only. Fed.R.Civ.P. 56.

IT IS FURTHER RECOMMENDED that defendants' motion [doc. # 63] otherwise be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) business days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of

filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 16th day of July, 2009.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE